VIACOM INTERNATIONAL INC. and Showtime Networks Inc., Plaintiffs,

v.

TIME INCORPORATED, Home Box Office, Inc., American Television & Communications Corporation, and Manhattan Cable Television, Inc., Defendants.

TIME WARNER INC., Home Box Office, Inc., American Television & Communications Corporation, and Manhattan Cable Television, Inc., Counterclaim-plaintiffs,

v.

VIACOM INC., Viacom International Inc., Showtime Networks Inc., and MCTV Networks, Inc., Counterclaim-defendants.

No. 89 Civ. 3139 (LMM).

United States District Court, S.D. New York.

Feb. 3, 1992.

Unsealed on Feb. 7, 1992.

Simpson Thacher & Bartlett, New York City, for plaintiffs.

Cravath Swaine & Moore, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiffs Viacom International Inc. ("Viacom") and Showtime Networks Inc. ("SNI") commenced this action in the spring of 1989. The Complaint alleges anticompetitive and monopolistic activities by Defendants Time Inc. ("Time"), Home Box Office, Inc. ("HBO, Inc."), American Television & Communications Corporation ("ATC") and Manhattan Cable Television, Inc. ("MCTV") in violation of the federal antitrust laws[1] and certain common law duties. Defendants move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for partial judgment on the pleadings or, in the alternative, pursuant to Rule 56(c) for partial summary judgment.[2] Defendants seek dismissal of Plaintiffs' Fourth Claim for Relief, which alleges "monopolization of certain local markets for cable television in the United States ... and an abuse and misuse of monopoly power in those markets to gain a competitive advantage and restrain trade unreasonably in the market for pay television programming services in the United States, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2." (Compl. ¶ 133.) Defendants also seek dismissal of those portions of the Fifth and Seventh Claims (alleging, respectively, unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and unfair competition in violation of certain state law duties) insofar as they are pleaded against Defendants ATC and MCTV.

*Parties*[3]

Plaintiff Viacom, an entertainment and communications company, is an Ohio corporation with its principal executive offices located in New York City. Plaintiff SNI is a subsidiary of Viacom and operates two pay television programming services[4], Showtime and The Movie Channel.

Defendant Time, whose eventual merger with Warner Communications Inc. resulted in the creation of Time Warner Inc. ("Time Warner"), is identified in the Complaint as a corporation organized under the laws of the State of Delaware, with its principal

---

1. Specifically, the Complaint alleges violations of 15 U.S.C. §§ 1 and 2 (Sections 1 and 2 of the Sherman Act) and 15 U.S.C. § 18 (Section 7 of the Clayton Act).

2. Defendants' motion addressed to the Fourth and Fifth Claims for Relief is denominated in the alternative as one brought pursuant to Fed. R.Civ.P. 12(c) or Fed.R.Civ.P. 56(c). The motion addressed to the Seventh Claim for Relief is brought pursuant to Fed.R.Civ.P. 12(c).

3. Except as otherwise noted, the description of the parties is drawn from the allegations of the Complaint.

4. Television programming services, such as Plaintiff SNI's Showtime and The Movie Channel and Defendant HBO, Inc.'s Home Box Office, function, along with cable system operators and individual viewers (or "subscribers"), as components of what Judge Leisure has described as a three-link chain of distribution in the subscription television industry. *See Telstat*

*v. Entertainment & Sports Programming Network,* 753 F.Supp. 109, 110 (S.D.N.Y.1990). Unlike viewers of traditional broadcast television, subscribers to cable (a popular form of subscription television) receive programming in exchange for the payment of subscription fees to cable system operators who function as local distributors in the areas they serve, usually under exclusive franchises from local municipal or county authorities. In addition to "basic cable," subscribers may choose to obtain the "premium" programming made available—for an additional fee, usually paid monthly—by the cable operator. In general, pay television programming services such as Showtime, The Movie Channel, and HBO create or obtain the rights to television programs, arrange them in schedules, and transmit the programming so assembled, via communications satellites, to cable system operators, who offer it to subscribers as described above.

place of business in New York City. The Complaint alleges that Time is "among the largest entertainment and publishing conglomerates in the world." (Compl. ¶ 7.) The Amended and Supplemental Answer (hereinafter the "Answer") generally denies this allegation but admits that subsidiaries of Time Warner include companies that engage in the operation of cable television systems and the distribution of television programming services. (Answer ¶ 7.)

Defendant HBO, Inc. is a wholly-owned subsidiary of Time Warner with its principal place of business in New York City.[5] According to the allegations of the Complaint, HBO, Inc., through its two pay programming services, HBO and Cinemax, "dominates the pay television programming services business in the United States," with approximately 23 million subscribers comprising approximately 65 percent of all pay television subscribers nation-wide. (Compl. ¶ 8.) Defendants generally deny this allegation but admit that approximately 17 million people subscribe to the HBO programming service and approximately 6 million subscribe to Cinemax. (Answer ¶ 8.)

Defendant ATC, an operator of cable systems, is a subsidiary of Time Warner[6] with its principal executive offices in Stamford, Connecticut. Although the precise scope of ATC's operations is disputed, the parties agree that ATC is the second largest cable operator in the United States, (Compl. ¶ 9; Answer ¶ 9), functioning as of December 31, 1988, under 767 franchises throughout the country (Pls.' Local Rule 3(g) Statement ¶ 4; Defs.' Local Rule 3(g) Statement ¶ 15).[7]

Defendant MCTV is a wholly-owned subsidiary of ATC. The parties agree that as of the time that the Complaint and Answer were filed, MCTV was the only cable television system operator holding a franchise to provide cable service below 79th street on the West Side of Manhattan and below 86th Street on the East Side. The Complaint alleges that MCTV has 245,000 basic cable subscribers and 201,000 pay television subscribers and controls the only cable access to 370,000 homes in the area of Manhattan in which it is franchised. (Compl. ¶ 10.) The Answer alleges that MCTV has approximately 232,000 basic cable subscribers and approximately 102,000 pay television service subscribers, and that the area of Manhattan in which MCTV is franchised to offer cable television services comprises approximately 430,000 homes. (Answer ¶ 10.)

*Defendants' Motion*

*The Alternative Designation Under Rules 12 and 56*

Defendants' motion, denominated in the alternative as a motion for judgment on the pleadings, pursuant to Rule 12(c), or as a motion for partial summary judgment, pursuant to Rule 56,[8] is primarily addressed to the Fourth Claim for Relief set forth in the

---

5. The Complaint alleges that "Defendant HBO, Inc. is a wholly owned subsidiary of Defendant Time...." (Compl. ¶ 8.) The Answer generally denies this averment but states that "HBO, Inc. is a wholly owned subsidiary of Time Warner with its principal place of business at 1100 Avenue of the Americas [in New York City]." (Answer ¶ 8.)

6. The Complaint alleges that "Defendant ATC is an 82 percent owned subsidiary of [D]efendant Time...." (Compl. ¶ 9.) Defendants answer that Time Warner owns 82% of ATC's stock and 93% of the combined voting power of the two classes of its common stock. (Answer ¶ 9.)

7. Plaintiffs assert that "[a]s of October 31, 1990, ATC own[ed] or manage[d] cable systems capable of reaching or 'passing' 7.65 million homes in the United States" and that "[t]he only cable access pay television program services have to these 7.65 million homes is through ATC." (Pls.' Local Rule 3(g) Statement ¶ 4.) According to Defendants, the areas in which ATC offers cable television services comprise approximately 7.2 million homes and accounted, as of December 31, 1988, for approximately 4 million subscribers to ATC's basic cable service, of whom approximately 3.1 million were also subscribers to pay television services. (Defs.' Local Rule 3(g) Statement ¶ 15.)

8. The alternative designation applies to all except that portion of the motion that seeks dismissal of the Seventh Claim for Relief insofar as it is pleaded against Defendants ATC and MCTV. *See supra* note 2. With respect to the Seventh Claim, Defendants seek dismissal as against ATC and MCTV on jurisdictional grounds.

Complaint at Paragraphs 132–135.[9] Defendants' argument turns, in the main, on the contention that Plaintiffs' failure to allege that ATC and MCTV possess market power in the national market for pay television programming services is fatal to their claim of monopolization in violation of Section Two of the Sherman Act; despite its alternative designation as one for partial summary judgment, Defendants' motion with respect to the Fourth Claim highlights, principally, alleged deficiencies in the pleadings, and it is supported by skeletal affidavit testimony concerning the structure of the markets relevant to the motion and the extent of Defendants ATC and MCTV's percentage share of those markets.[10]

As the appearance and content of Defendants' moving papers and supporting documents make clear, that portion of the instant motion alternatively designated as one for partial summary judgment is atypical of motions brought pursuant to Fed. R.Civ.P. 56, and particularly atypical of motions for summary judgment interposed at or near the end of discovery. In the place of extensive affidavits, deposition testimony, and similar documentation purporting to demonstrate the absence of material factual issues for trial, Defendants rely almost exclusively on a brief affidavit (the "Gerken Affidavit"), including cable industry statistics, purporting to demonstrate the deficiency of Plaintiffs' pleadings and the insurmountability of Plaintiffs' alleged failure adequately to set forth certain essential elements of a cause of action under the antitrust laws. The Gerken Affidavit, however, contains nothing necessary to the disposition of the motion before the Court; rather, it elaborates what is apparent on the face of the Complaint—i.e. that Plaintiffs do not allege, and presumably could not hope to prove, that ATC and MCTV possess any significant percentage share of the total number, nation-wide, of homes passed by basic cable, or of the total number, nation-wide, of basic or pay cable subscriptions.

In these circumstances, and at this early stage in the proceedings, Defendants' motion is most appropriately considered in its entirety—including those portions that seek dismissal of the Fourth Claim for Relief—as a motion on the pleadings pursuant to Rule 12(c). Accordingly, the Court relies in this Memorandum and Order on nothing submitted by either party, by affidavit or otherwise, outside of the Complaint and Answer.[11]

**9.** Defendants' argument for judgment on the pleadings or summary judgment on the Fourth Claim for Relief comprises approximately twenty-seven pages of the Memorandum supporting Defendants' motion. Thirteen pages of the Memorandum are devoted to Defendants' preliminary statement and elaboration of factual background. Defendants' arguments addressed to the Fifth and Seventh Claims together comprise just under five full pages of the Memorandum.

**10.** Plaintiffs identify two cable markets as relevant to the disposition of their claims: a market for pay television programming services, which is alleged to be nation-wide in scope, and a market for local delivery of cable television to subscribers. (Compl. ¶¶ 16, 23.) For the purposes of this motion, Defendants assume the existence of both markets. (Defs.' Mem.Supp. at 3–4.) The Court likewise assumes, for the purposes of this motion, the existence of both markets and their relevance to the disposition of Plaintiffs' claims.

**11.** A note about the procedural implications of Defendants' decision to proceed under Rule 12(c) is in order here. A Defendant's pre-answer motion to dismiss for failure to state a claim upon which relief may be granted is of course a motion pursuant to Rule 12(b)(6); the Rule 12(c) motion for judgment on the pleadings may be interposed after the answer is filed, as a vehicle for raising defenses enumerated in Rule 12(b) that have not been raised in the pleadings or by preliminary motion and that are expressly preserved by Rule 12(h). *See* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice And Procedure* ¶ 1367 (1990). Thus the defense of failure to state a claim may be the subject of a Rule 12(c) motion because Rule 12(h)(2) so provides, and Defendants' Rule 12(c) motion addressed to the Fourth and Fifth Claims is not improper here; similarly, the purported jurisdictional defect of which Defendants complain in the motion addressed to the Seventh Claim for Relief may be raised in the Rule 12(c) motion because that maneuver is apparently contemplated by Rule 12(h)(3). *See Id.* The standards to be applied to a Rule 12(c) motion that identifies deficiencies in the pleadings are those that would have been appropriate to the disposition of a preanswer motion under Rule 12(b). *See Id.* at 515–16 ("The mere fact that these procedural defects are raised in the

The Fourth Claim for Relief

Plaintiffs' Fourth Claim for Relief, captioned "Sherman Act § 2: Monopolization By All Defendants Of Certain Local Markets For Cable Television Systems," alleges that particular conduct of Defendants Time, HBO, Inc., ATC and MCTV set forth in previous allegations of the Complaint

> constitutes monopolization of certain local markets for cable television in the United States ... and an abuse and misuse of monopoly power in those markets to gain a competitive advantage and restrain trade unreasonably in the market for pay television programming services in the United States, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

(Compl. ¶ 133.) The Fourth Claim alleges further that

> Defendants Time, HBO, Inc., ATC and MCTV possess monopoly power in certain of the local markets for cable television systems, and have willfully obtained and maintained and exercised monopoly power, and have further used, abused and misused monopoly power in certain of the local markets for cable television to obtain a competitive advantage, restrain trade, and monopolize, conspire to monopolize, and attempt to monopolize the market for pay television programming services in the United States.

(Compl. ¶ 134.)

Defendants advance, in essence, three arguments in support of their contention that the Fourth Claim should be dismissed. As noted above, Defendants argue most strenuously that the Fourth Claim founders on Plaintiffs' failure to allege, and asserted inability to prove, market power of Defendants ATC and MCTV in the relevant market, which, for the purposes of the Fourth Claim Section 2 analysis, Defendants define as the national market for pay programming services.

Alternatively, Defendants argue that relief under the Sherman Act should be held unavailable in circumstances where, as Defendants assert has happened here, the activities complained of implicate concerns addressed by Congress in the Cable Communications Policy Act of 1984 (the "Cable Act"). According to Defendants, "The Sherman Act cause of action asserted by [P]laintiffs would effectively supersede [the] detailed provisions [of the Cable Act], inviting treble damage actions by any programmer which feels it was spurned by any one of the thousand cable systems nationwide." (Defs.' Mem.Supp. at 31.)

■ Finally, Defendants contend that the Fourth Claim contains an allegation that refusals to deal by ATC and MCTV constitute a conspiracy to monopolize in violation of the Sherman Act, Section Two, and that such an allegation is frivolous insofar as Plaintiffs fail to allege a combination of independent "economic actors" and insofar as they fail to allege and will be unable to prove specific intent to monopolize on the part of Defendants.[12]

---

guise of a Rule 12(c) motion should not affect the manner by which the court determines what essentially are Rule 12(b) matters.") Thus a trial court reviewing a defendant's motion for judgment on the pleadings must consider as true all well pleaded factual allegations of the complaint, and must draw all inferences in favor of the nonmoving party. *Id.* ¶ 1368. *See also Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989). This Court notes its concurrence in the view that partial judgment on the pleadings should be available, in appropriate circumstances, by analogy to the provisions of Rule 56(d) governing partial summary judgment, notwithstanding the absence of any clearly comparable provision in Rule 12(c). 5A Wright & Miller, *supra,* ¶ 1369 at 537.

**12.** In further support of the motion to dismiss the Fourth Claim, Defendants argue that the

"essential facilities" doctrine invoked by Plaintiffs does not relieve Plaintiffs of the burden of pleading and proving market power in the relevant market. Although the essential facilities doctrine is sometimes analyzed as a distinct claim under the Sherman Act, *see Soap Opera Now, Inc. v. Network Publishing Corp.,* 737 F.Supp. 1338, 1343 (S.D.N.Y.1990), this Court generally concurs in Defendants' view that the doctrine is more properly characterized as a label that may aid in the analysis of a monopoly claim, not a statement of a separate violation of law. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 736.1a (Supp.1990). It follows that the essential facilities argument relieves Plaintiffs here of no burden they would otherwise bear, and constitutes no substitute for a showing that the requirements of a cause of action under the antitrust laws have been met.

Not surprisingly, Plaintiffs strenuously oppose dismissal of the Fourth Claim for Relief, contending that the violations of the Sherman Act alleged therein are neither inadequately pleaded nor effectively superseded by the Cable Act. With respect to Defendants' principal argument in support of dismissal, the alleged failure to demonstrate market power of Defendants ATC and MCTV in the national market for pay television programming services, Plaintiffs assert both that Defendants are wrong as a matter of law—in essence, that the failure to allege national market power on the part of ATC and MCTV is irrelevant to the sufficiency of a pleading that turns on a claim of monopoly "leveraging" by local monopolists—and that Defendants have misread the Complaint and overlooked an allegation of actual monopolization by Defendants ATC and MCTV. The Court will consider each of these arguments.

Monopoly Leveraging

According to Plaintiffs, the Fourth Claim for Relief contains two separate allegations under the Sherman Act: the "monopoly leveraging" claim (which turns on the asserted abuse of monopoly power by Defendants ATC and MCTV in certain local markets for cable television to effect a distortion of the national market for pay television programming services), and the actual monopolization claim.

With respect to the "monopoly leveraging" component of the Fourth Claim for Relief, Plaintiffs assert that the Fourth Claim properly sets forth an allegation that Defendants exploit the monopoly position of ATC and MCTV in certain local markets (which monopoly position is conceded by Defendants for the purposes of the motion) to effect a distortion of the larger (national) programming services market in which Defendant Time, Inc. (through its subsidiary, HBO, Inc.) allegedly enjoys market power. According to Plaintiffs, the leveraging claim stands or falls not on ATC or MCTV's percentage share of the national market for pay television—a market in which Plaintiffs do not appear to contest Defendants' assertion that ATC and MCTV possess negligible power[13]—but rather on the percentage of the programming services market over which Defendant Time, Inc., through its subsidiary, HBO, Inc., allegedly exerts control, and on the interplay between that power in that national market and the allegedly exclusionary activities of ATC and MCTV in the local markets.

Essentially, Plaintiffs argue that ATC and MCTV's asserted discrimination against Plaintiff SNI's subsidiaries denies Plaintiffs access to subscribers in the local markets in which ATC and MCTV's cable systems operate under franchise from local authorities; that denial of access, Plaintiffs contend, prevents Plaintiffs from taking advantage of economies of scale enjoyed by Defendants. The gravamen of Plaintiffs'

---

Of course, even without stating a separate antitrust claim, the essential facilities analysis may lend theoretical support to a claim of actual or attempted monopolization, *Soap Opera Now* at 1343, and color to an antitrust plaintiff's description of the circumstances giving rise to his prayer for relief. But the weight of the argument as made by Plaintiffs here in connection with their claim under Section Two of the Sherman Act need not be determined, since the Court finds as a matter of pleading that the Fourth Claim for Relief fails to allege actual monopolization of local cable markets but adequately states a claim of monopoly leveraging. See *infra* pp. 377–81.

13. Defendants' statement pursuant to Local Rule 3(g) includes a recitation of statistics (culled from the Kagan Census of Cable and Pay Television and the Kagan Census of Cable System Ownership) indicating ATC and MCTV market shares of several cable markets in the years 1981–1989. During that period, ATC's percentage share (including MCTV) of the total number of homes in the United States "passed" by cable is claimed never to have exceeded 9.4%; its share of total subscribers to basic cable television never to have exceeded 9%; and its share of total pay subscriptions never to have exceeded 9.3%. (Defs.' Local Rule 3(g) Statement, ¶¶ 17–19.) Plaintiffs' Local Rule 3(g) Statement contains no direct response to these assertions. In response to Defendants' contention that ATC and MCTV at no time relevant to the motion possessed market power in the market "containing" pay television programming (Defs.' Local Rule 3(g) Statement ¶¶ 27–28), Plaintiffs state that ATC and MCTV, through their "monopoly power over access to a substantial number of cable subscribers, [have] the power to distort competition in the market for pay television programming services." (Pls.' Local Rule 3(g) Statement ¶¶ 17–18.)

leveraging claim is that ATC and MCTV's ability to exclude SNI and its subsidiary programming services from the local markets in which ATC and MCTV allegedly possess monopoly power effects a distortion of the national market for pay programming services that is actionable under the Sherman Act. This is so, Plaintiffs argue, even if the segment of the national market for pay programming allegedly foreclosed to Plaintiffs through the discriminatory activities of ATC and MCTV amounts to a percentage share (arguably less than 10%) that would be insufficient to constitute market power for the purposes of straightforward monopoly analysis under the antitrust laws.

As Plaintiffs would have it, the effect of foreclosure from those local markets in which Defendants maintain control through their exclusive operation of ATC and MCTV cable systems is magnified through an interplay of market forces that allows Defendants to exploit—and forces Plaintiffs to forego—essential economies of scale, and that guarantees Defendants' exclusive access to a subscriber base whose absolute value in numbers of individuals appears insignificant, but whose marginal value is extreme. "By flatly denying [P]laintiffs access to subscribers in [D]efendants' affiliated systems, [D]efendants achieve an insurmountable cost advantage over HBO, Inc.'s competitors which [D]efendants have exploited to ensure that their rivals 'never obtain the subscriber base necessary to long-term survival in the national market....'" (Pls.' Mem.Opp'n at 35–36, quoting Compl. ¶ 22.) In the context of their opposition to Defendants' motion, Plaintiffs say, this formulation of the monopoly leveraging claim raises, at very least, "a question of fact that the monopolization of certain local markets for cable television systems has facilitated actual or attempted monopolization of the national market for pay television programming services." (Pls.' Mem.Opp'n at 25–26.)

A leading Second Circuit case involving a claim of monopoly "leveraging" under the Sherman Act, Section Two, is *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). In *Berkey*, the Second Circuit addressed the question whether a violation of Section Two exists where a firm uses monopoly power in one market to achieve competitive advantage in another, even in the absence of any attempt to monopolize the second market. The *Berkey* court held that in such circumstances the prohibitions of Section Two do apply. "There is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other," the Court wrote. "That the competition in the leveraged market may not be destroyed but merely distorted does not make it more palatable. Social and economic effects of an extension of monopoly power militate against such conduct." *Id.* at 275.

■ It appears clear that a claim under the Sherman Act is stated both where a company leverages power in one market to create monopoly in another, *see United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and where a company uses monopoly power in one market to impede competition in another, whether or not it attempts to monopolize the second market, *Berkey*, 603 F.2d at 275, with resulting "tangible harm to competition," *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir.1990). Plaintiffs' allegations in the instant case are of course distinguishable from those involved in *Griffith, Berkey*, or *Twin Laboratories*, since Defendants here are said to possess monopoly or market power in both of the relevant markets: Defendants ATC and MCTV are assertedly monopolists in the local markets for cable television systems, Defendant HBO, Inc. is alleged to possess monopoly power in the national market for pay television programming services, and Defendant Time, "acting through Defendant HBO, Inc.," is said thereby to occupy a position of power in the national pay programming services market as well.

■ As previously noted, Defendants take the position that Plaintiffs' monopoly leveraging claim must fail as a matter of

law insofar as the alleged foreclosure of Plaintiffs' programming services from cable systems owned and operated by Defendants ATC and MCTV could at most prevent Plaintiffs' access to less than 10% of all cable television subscribers nationwide. This Court's reading of *Berkey* counsels otherwise.

■ It is of course axiomatic that the antitrust laws do not operate to prevent a vertically integrated firm from reaping the rewards of its efficiency or to punish a company that profits from its expertise and innovativeness. *United States v. Columbia Steel Co.*, 334 U.S. 495, 525–26, 68 S.Ct. 1107, 1123–24, 92 L.Ed. 1533 (1948); *Berkey*, 603 F.2d at 276. But the distinction between the commercial success that ideally crowns the efforts of those who labor diligently for competitive advantage, and the market stronghold born of exclusionary practices that the antitrust laws seek to prevent, may be a murky one; indeed, in the absence of a developed record it can be all but impossible to discern. In *Berkey*, the Court of Appeals found itself unable to determine, on the record before it, whether the Eastman Kodak Company had leveraged its market power in photographic film to gain an unfair advantage over its competitors in photofinishing equipment and services or whether, on the contrary, the company had simply availed itself of certain benefits of size and integration to produce a film and camera combination whose commercial success resulted naturally in competitive advantage to Kodak's photofinishing and equipment branches.

In the instant case, the ultimate success of the monopoly leveraging claim will depend on Plaintiffs' substantiation of the allegation that their inability to extend their subscriber base into areas (arguably) controlled by sister companies of Defendant HBO, Inc. and its subsidiaries results in Plaintiffs' being effectively priced out of the national market for pay programming services, and that competition in that market suffers accordingly. On a more theoretical level, the question on which resolution of the leveraging claim ultimately turns is whether (a) ATC and MCTV's ac-

tivities in the local markets in which they possess monopoly power—including any refusals to deal with Plaintiff SNI and its subsidiaries—operate to the advantage of Defendant HBO, Inc.'s programming services only in the permissible sense in which one department of an integrated business (including one that enjoys monopoly power) is allowed to benefit from its association with another or (b) the vertical integration analysis is inapposite here, and a violation of the Sherman Act consists in the fact that lawfully acquired monopoly power (such as that enjoyed by ATC and MCTV in the local markets) is used to prevent or impede competition in a another economic arena (such as the national market for pay television programming services).

■ Like the Second Circuit panel that decided *Berkey*, this Court finds it impossible, on the existing record, to determine as a matter of law that Plaintiff will be unable to establish monopoly leveraging here. To paraphrase Judge Kaufman's opinion for the Court of Appeals in *Berkey*, the Court "cannot dismiss the possibility" that Defendants' monopoly power in certain local cable markets has contributed to the entrenchment of Defendant HBO, Inc.'s monopoly (or market) power in the national market for pay programming services and so—through HBO, Inc.—to the market power of Defendant Time. *See Berkey*, 603 F.2d at 292. The issue to be resolved in the context of the Rule 12 motion is not whether it appears to the Court that Plaintiffs' case is a strong one or their theory airtight; rather, the Court must determine whether the proof of any set of facts consistent with the allegations of the Complaint would entitle Plaintiffs to relief. *See Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832–33, 104 L.Ed.2d 338 (1989). *See also* 5A Wright & Miller, *supra*, ¶ 1357. Although Defendants may finally prevail on the theory that the alleged denial of access to something less than 10% of the national subscriber base for cable television effects no redressable alteration of competition in the national market for pay programming services, Plaintiffs must have an opportunity to try to prove distor-

tion of the national market sufficient to entitle them to relief under *Berkey*.[14]

### Monopolization of Local Markets

Plaintiffs' argument with respect to actual monopolization, as set forth in Plaintiffs' Memorandum in Opposition to the Motion to Dismiss, is easily summarized: Plaintiffs contend that Defendants ATC and MCTV possess monopoly power in the local markets for delivery of cable television in which they operate, and that as local monopolists they engage in prohibited anticompetitive activities, including discriminatory treatment of Plaintiffs' subsidiaries, and refusals of access to cable systems in ATC and MCTV franchise areas.

Although a first or casual perusal of the Fourth Claim for Relief does not immediately reveal the actual monopolization claim, on closer reading it appears that the first phrase of Paragraph 133 does contain an allegation of actual monopolization in certain local markets for cable television, and that the first part of Paragraph 134, considered in isolation, alleges willful acquisition, maintenance, and exercise of monopoly power by Defendants in those markets. Less apparent, however, is the exegesis of the preceding paragraphs of the Complaint—incorporated by reference in the Fourth Claim for Relief—through which Plaintiffs purport to demonstrate that the Fourth Claim's allegation of actual monopolization consists of more than the conclusory averments of Paragraphs 133 and 134.

■ The act of monopolization prohibited by 15 U.S.C. § 2 consists of two elements: "the possession of monopoly power in the relevant market and ... the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). It is, of course, not monopoly itself but rather the use of monopoly power to impede competition (or the "purpose or intent to exercise that power") that the antitrust laws fundamentally abhor. *Berkey*, 603 F.2d at 274 (quoting *Griffith*, 334 U.S. at 107, 68 S.Ct. at 945); *see also* 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶¶ 614–624 (1978).

■ The problem with Plaintiffs' purported actual monopolization of local markets claim is not that it fails to appear in the Fourth Claim for Relief, but rather that the bare allegation contained therein elaborates (and is elaborated by) nothing that appears elsewhere in the body of the Complaint. The section of the Complaint entitled "Conduct Giving Rise to Violations of Law: Overview" is instructive in this regard. Plaintiffs allege that Defendants "have devised a strategy ... to tie up the narrow bottleneck cable outlets and to tie up the scarce, most desirable film inputs for pay television programming services. After [D]efendants control the scarce input and output markets, no one else will be

---

**14.** *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), a case upon which Defendants rely in part in their argument in support of the motion addressed to the Fourth Claim for Relief, is not to the contrary. In *Tampa*, the Supreme Court's holding that an exclusive requirements contract did not violate the proscriptions of the Clayton Act was premised on a determination that the arrangement did not "work a substantial ... lessening of competition in the relevant competitive market"—there the market for production and sale of bituminous coal—because it involved "neither a seller with a dominant position in the market ... nor myriad outlets with substantial sales volume coupled with an industry-wide practice of relying upon exclusive contracts ... nor a plainly restrictive tying arrangement ..." *Tampa*, 365 U.S. at 333, 334, 81 S.Ct. at 631.

The instant case is distinguishable from *Tampa* in the significant sense that Defendant HBO, Inc., a seller of pay programming services, is alleged to dominate the national market for pay television programming—the arena in which Plaintiffs' and Defendants' subsidiary services compete.

*Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566 (2d Cir.1990), also is not to the contrary. Although it characterizes as dictum a similarly worded formulation which appears on page 284 of the decision in *Berkey*, *Twin Laboratories* casts no doubt on the continuing viability of *Berkey's* holding that "a firm violates § 2 [of the Sherman Act] by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market," *Berkey*, 603 F.2d at 275.

able to compete with them and the price of pay television programming services will rise." (Compl. ¶ 28.) In pursuit of this end, Plaintiffs allege, Defendants engage and have engaged in various prohibited activities, including monopolization of certain local markets for cable television.

In every paragraph of the Complaint in which an allegation of anticompetitive activity within a local cable market occurs, there appears a reference to Defendants' supposed ultimate goal, which is the maintenance and entrenchment of HBO, Inc.'s monopoly power and the continuing advantage of its subsidiary programming services, HBO and Cinemax. Thus Paragraph 37, which opens the section of the Complaint entitled "Defendant ATC's Refusal to Deal with Viacom's Services," avers that "[t]o disadvantage pay services which compete with [D]efendant HBO, Inc. and maintain and entrench HBO, Inc.'s monopoly power, [D]efendant ATC has refused access on its cable systems to competing pay services, notably Showtime and The Movie Channel, or has provided access only on a discriminatory basis...." Paragraph 44 alleges that "Defendants ... have abused and misused the monopoly power of [D]efendants ATC and MCTV in the local cable television market in which [D]efendants ATC and MCTV operate so as to exclude ... Showtime and The Movie Channel, the key competitors of [D]efendant HBO, Inc."

Although generally supportive of the monopoly leveraging theory (see *supra* pp. 377–80), these allegations do not state a claim of monopolization in the local markets. Simply put, the purported "local monopolization" claim is not free-standing: in the place of allegations that Defendants exercise local monopoly power to exclude other cable systems operators or otherwise to impede competition in the *local market* (i.e., the market for the delivery of cable television to subscribers), the Complaint alleges that Defendants use and abuse their local monopoly power to impede the progress of Plaintiffs' subsidiary pay programming services, which are players in the *national* market for those services and competitors not of Defendants ATC and MCTV (the alleged local monopolists) but

rather of their sister company, HBO, Inc. and its subsidiaries. Except in connection with allegations concerning ultimate manipulation of the market for pay programming services in which HBO, Inc. is a competitor, the Complaint contains no allegation (beyond the conclusory statements of the Fourth Claim for relief) that Defendants ATC and MCTV have willfully acquired, maintained or exercised monopoly power in the local markets in which they operate under franchise.

Conspiracy to Monopolize

 In further support of the motion to dismiss the Fourth Claim for Relief, Defendants attack the sufficiency of the "conspiracy claim" assertedly contained in lines 6–7 of ¶ 134. Defendants' argument that the Fourth Claim for Relief contains a frivolous allegation of conspiracy to monopolize in violation of The Sherman Act, Section Two, is unpersuasive. As a preliminary matter, the Court notes that the Fourth Claim, by its terms, incorporates the preceding 131 paragraphs of the Complaint—including paragraphs 65 through 96, in which Plaintiffs allege that Defendant HBO, Inc. engaged in the coercion of unaffiliated cable companies in an anticompetitive effort to expand the market shares of HBO and Cinemax, and thereby to enhance and entrench the market power of Defendant Time. The incorporation by reference of these allegations defeats Defendants' argument that the Fourth Claim is insufficient in that it fails to identify the plurality of economic actors required to support an allegation of conspiracy to monopolize under the Sherman Act. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

 Nor does the Court agree that Plaintiffs "have not alleged, and could not prove," the specific intent to achieve unlawful monopoly that is an element of a conspiracy claim under 15 U.S.C. § 2. Although the language of Paragraphs 132–135 contains no express allegation of specific intent to monopolize, the incorporated Paragraphs 65 through 96 refer clearly and

repeatedly to activities allegedly undertaken with the intent to distort or destroy competition through product preemption (Compl. ¶¶ 65–72), predatory pricing (Compl. ¶¶ 73–82), and exclusionary promotional campaigns (Compl. ¶¶ 83–96). With respect to Plaintiffs' asserted inability to *prove* specific intent to monopolize, the Court rejects Defendants' argument based on Plaintiffs' failure to allege that refusals to deal by Defendants ATC and MCTV result in the foreclosure of Plaintiffs' pay programming services from a substantial portion of the national market. For the reasons set forth above in connection with the monopoly leveraging element of the Fourth Claim for Relief, the Court declines to find as a matter of law that the insubstantiality of Defendants ATC and MCTV's percentage share of the nation's cable subscriber base necessarily precludes a showing by Plaintiffs that their subsidiaries have been effectively foreclosed from competition in the national market for pay programming services.[15]

The Cable Act of 1984

■ Defendants' third argument in support of the motion to dismiss the Fourth Claim centers on the interplay between the antitrust laws and the policies underlying the Cable Act of 1984. In essence, Defendants contend that the cause of action on which Plaintiffs seek relief pursuant to the Sherman Act is precluded by the existence of the Cable Act insofar as any recovery by Plaintiffs could entitle them to treble damages under the antitrust laws which are not available under the provisions of the Cable Act. According to Defendants, Plaintiffs seek recovery for the refusal to deal of individual cable systems whose sole obligations arise under the detailed regulatory provisions of the Cable Act, and who there-

for are not subject to a generalized duty to deal under the antitrust laws. Defendants do not assert that the Cable Act expressly immunizes their activities from antitrust liability; rather, they advance a theory of "implied immunity" from prosecution under the antitrust laws. In this argument, too, the Court is unpersuaded by Defendants' reasoning and declines to dismiss the Fourth Claim for Relief on the grounds urged.

■ In certain circumstances, the pervasiveness of a regulatory scheme enacted by Congress may be such that courts will infer legislative intent to assign primary authority to the regulatory agency, thus displacing application of the antitrust laws. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 373–374, 93 S.Ct. 1022, 1027–28, 35 L.Ed.2d 359 (1973). It is by now axiomatic, however, that the courts do not casually infer such repeals by implication: "Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975) (quoting *United States v. Philadelphia National Bank*, 374 U.S. 321, 351, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963)). As the Second Circuit has pointed out, "[t]he touchstone of [the implied immunity] analysis is Congressional intent ... since the principle is founded on the notion that, in some circumstances, a Congressional delegation of regulatory authority carries with it the implication that the antitrust laws shall not apply to the conduct thus regulated." *Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, 82 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (citation omitted).[16]

---

**15.** Having rejected Defendants' arguments that the "conspiracy element" of the Fourth Claim for Relief is insufficient as a matter of pleading and will be unprovable as a matter of law, the Court notes that it is also unpersuaded by Defendants' reading of the Fourth Claim to contain an allegation of conspiracy to monopolize that is independent of the other allegations of Paragraphs 132–135. Although it is unnecessary to the reasoning elaborated in this Memorandum

and Order so to construe Plaintiffs' intent, the Court reads the conspiracy reference contained in lines 6–7 of Paragraph 134 primarily to track the language of the statute, and does not assume that the inclusion of the phrase was intended by the draftsman to do more than elaborate the allegation of monopoly leveraging upon which the Fourth Claim is centrally founded.

**16.** Scholarly authority confirms the view that it is not so much the "pervasiveness" of a regula-

In enacting the Cable Act, Congress made manifest its intention to accommodate—rather than to displace—the procompetitive goals of the antitrust statutes. The legislative history of P.L. 98–549 clearly sets forth Congress' interest in ensuring, in cable as elsewhere in the communications industry, "the widest possible dissemination of information from diverse and antagonistic sources" that is the goal of the First Amendment. H.R.Rep. No. 934, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4668 (quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)). Noting that regulations addressed to the structure of the communications industry are consistent with the First Amendment insofar as they foster the ends of diversity without significantly interfering with the content of speech, Congress suggested that permissible "structural" regulation of the communications media includes both enforcement of the antitrust laws *and* the kind of regulatory scheme contemplated by the Cable Act. *Id.* And in enacting the leased access provisions upon which Defendants' implied immunity argument principally relies, the drafters of the Cable Act emphasized their intention to affect only the exercise of the cable operators' editorial control, and not their economic position:

> The Committee recognizes that cable operators could frustrate the intent of this section by establishing price, terms and conditions which provide financial disincentives for third party programmers to offer their cable services. Thus, while the Committee is very sensitive to the notion that this scheme of mandated leased access not undermine the economic viability of a cable system, a cable operator's decisions respecting price, terms and conditions are subject to a standard of reasonableness.... Moreover, the Committee does not intend in

any way to affect the applicability of the antitrust laws to the cable operator with respect to the provision or use of channel capacity by unaffiliated parties.

*Id.* at 4687.

The Fifth Claim for Relief

 Plaintiffs' Fifth Claim for Relief, captioned "Sherman Act § 1: Unreasonable Restraint of Trade by all Defendants," alleges that particular conduct of Defendants Time and HBO, Inc. set forth in previous allegations of the Complaint

> constitutes a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in that, *inter alia*, each of the refusals of access, each of the time lock promotions, each of the refusals to promote Showtime and The Movie Channel, each of the buy through requirements, and each of the no switch provisions constitutes a contract, combination, and/or conspiracy that has unreasonably restrained trade in the market for pay television programming services in the United States.

(Compl. ¶ 137.)

Defendants argue that the Fifth Claim for Relief should be dismissed as against Defendants ATC and MCTV. The Court agrees. With respect to Defendants ATC and MCTV, the allegations of the Complaint, taken as a whole and read in the light most favorable to Plaintiffs, are insufficient to state a claim of contract, combination or conspiracy in violation of Section One of the Sherman Act. As Defendants point out, the reach of 15 U.S.C. § 1 does not extend to conduct that is "wholly unilateral." *See Copperweld*, 467 U.S. at 768, 104 S.Ct. at 2740. Plaintiffs do not appear to dispute Defendants' assertion that individually named Defendants ATC, MCTV, Time, and HBO, Inc. represent a single

tory scheme per se, but rather Congress' intent in enacting the legislation, and the effect of regulation on conduct arguably subject to the antitrust laws, that determines whether "implied immunity" from antitrust liability should be found. "[T]he scope and intensity of a regulatory regime does not indicate the extent to

which Congress intended to confer antitrust immunity or to vest the responsibility for competition in the regulators rather than the courts. The main issue is not the breadth of regulation within an industry, but the impact of regulation on the challenged conduct." 1 Areeda & Turner, *supra*, ¶ 223.

enterprise for the purposes of the Sherman Act § 1 analysis.

Paragraphs 57 through 108 of the Complaint contain Plaintiffs' allegations with respect to the allegedly anticompetitive "buy through" and "no switch" requirements (¶¶ 57–64), "product preemption" (¶¶ 65–72), "predatory pricing" (¶¶ 73–82), "time lock" campaigns (¶¶ 83–96), and exclusive contracts for first run feature films (¶¶ 97–108). None of the activities described in these paragraphs of the Complaint is specifically alleged to involve Defendants ATC or MCTV, and although ATC and MCTV are presumably among the local cable television systems referred to, these paragraphs contain no allegation of activity undertaken by ATC or MCTV in concert with any unaffiliated entity.

Paragraphs 31 through 56 allege anticompetitive efforts by Defendants Time and HBO, Inc. to defeat the "multi pay" phenomenon through affiliation agreements with cable operators (¶¶ 33–36), anticompetitive refusals of access to Showtime and The Movie Channel by Defendants ATC and MCTV (¶¶ 37–51), and discriminatory treatment of Plaintiff Viacom's services by Defendant Time, acting through Defendants HBO, Inc. and ATC (¶¶ 52–56). Although the allegations of these paragraphs do refer specifically to activities of Defendants ATC and MCTV, none alleges the concerted action by separate economic entities that is prerequisite to a finding of liability under the Sherman Act, Section 1. *Copperweld*, 467 U.S. at 768, 104 S.Ct. at 2740. In effect, the Fifth Claim for Relief can be read to implicate Defendants ATC and MCTV only insofar as it incorporates allegations that ATC and MCTV act in concert with Time and HBO, Inc. to refuse access to Plaintiffs' subsidiaries Showtime

and The Movie Channel in an anticompetitive effort to restrain trade in the market for pay television programming and thereby to solidify the advantage allegedly enjoyed by Defendants' pay services, Cinemax and HBO. This much alone cannot support a claim as against Defendants ATC and MCTV under *Copperweld*.[17]

The Pendent State Law Claims

■ Defendants' final argument in support of the motion to dismiss is addressed to the Seventh Claim for Relief, in which Plaintiffs seek to recover as against all Defendants based on asserted violations of state law prohibiting unfair competition. Defendants urge dismissal of the Seventh Claim as against ATC and MCTV on grounds that Plaintiffs' state law claims cannot independently survive dismissal of the Fifth Claim for Relief as against ATC and MCTV, and of the Fourth Claim for Relief as against all Defendants. Having declined Defendants' invitation to dismiss the Fourth Claim, the Court declines similarly their invitation to dismiss the Seventh for lack of pendent jurisdiction.

Dismissal of the Fifth Claim as against Defendants ATC and MCTV does not militate against the Court's retention of jurisdiction over the state law unfair competition claims asserted against those Defendants. As elaborated above, numerous activities of ATC and MCTV alleged in the Complaint cannot—by reason of their intracorporate nature—support a claim of contract, combination or conspiracy in unreasonable restraint of trade by Defendants ATC and MCTV in violation of the Sherman Act § 1. Notwithstanding this deficiency with respect to the Section One claim, however, the allegations contained in Paragraphs 145 through 148 of the Complaint (and the preceding paragraphs incorporated

**17.** Plaintiffs' argument in opposition to the motion to dismiss the Fifth Claim as against Defendants ATC and MCTV is wholly unavailing. The liberality of the federal rules governing pleading notwithstanding, Plaintiffs' hypothetical conjecture that, "[f]or example, if ATC were to agree with HBO, Inc. *and* the Disney Channel to a time lock promotion that excludes Showtime and The Movie Channel, a proper Section 1 claim would lie....", (Pls.' Mem.Opp'n at 43), cannot be said to constitute the "short and plain

statement of the claim showing that the pleader is entitled to relief" called for by Rule 8(a)(2) of the Federal Rules of Civil Procedure. Nor in any case does such a statement, or its equivalent, appear in any allegation of the Complaint. As for the sufficiency of the unelaborated allegation of conspiracy contained in Paragraph 137, the "bare bones" assertion of concerted action in restraint of trade will not withstand a motion to dismiss. *Telsat*, 753 F.Supp. at 115.

by reference therein) are sufficient to state a claim for state law unfair competition by Defendants ATC and MCTV. The retention of jurisdiction over those claims is therefore proper.

SO ORDERED.