INTERNATIONAL AUDIOTEXT
NETWORK, INC., Plaintiff,

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,
Defendant.

No. 92 Civ. 6454 (LMM).

United States District Court,
S.D. New York.

Dec. 16, 1994.

Affirmed, 62 F.3d 69.

Seham, Klein & Zelman by Jeffrey M. Schlossberg, New York City, for plaintiff.

Sidley & Austin by Elizabeth M. Sacksteder, New York City, for defendant.

### MEMORANDUM AND ORDER
McKENNA, District Judge.

**1:** *The Amended Complaint and the Agreement.*

Defendant American Telephone and Telegraph Company ("AT & T") moves, pursuant to Fed.R.Civ.P. 12(b)(6), for an order dismissing the Amended Complaint of plaintiff International Audiotext Network, Inc. ("IAN"). For the reasons set forth below, the motion is granted.

IAN asserts five claims against AT & T: (1) and (2), monopolization and an attempt to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (4) and (5), violations of Sections 201(b) and 202(a) of the Communications Act, 47 U.S.C. §§ 201(b) and 202(a).

IAN's claims all relate to a Cooperative Marketing Agreement between AT & T and Malhotra & Associates, Inc. ("Malhotra") entered into on May 6, 1991 (the "Agreement").[1] IAN and Malhotra are identified in the Amended Complaint (¶¶ 4, 5) as Information Providers, or "IPs," that is, firms that "provide various kinds of information and/or services via telephone to callers, such as stock quotes, time and temperature and horoscopes." (Am.Cplt. ¶ 4.) The parties at times refer to the services rendered by IPs as "audiotext" services.

As described by IAN, in the Agreement "AT & T agreed to pay Malhotra compensation based on the number of monthly minutes called from overseas to Malhotra's various telephone numbers." (*Id.* ¶ 13.)

The per minute compensation to Malhotra from AT & T represents a share of the revenue derived by AT & T from international calls originating outside the United States and terminating inside the United States. The fees that AT & T charges to foreign telephone companies to provide connections to the United States are known as accounting rates and are agreed upon in international negotiations. As the accounting rate of payments are based upon minutes of connect time, the stimulation of traffic to the United States from overseas increases defendant's revenue. The Agreement between Malhotra and AT & T provides Malhotra a fixed per minute share of the accounting rate receipts of AT & T for international calls terminating at Malhotra's audiotext service center.

(*Id.* ¶ 14.) The agreement was exclusive to Malhotra (*id.* ¶ 16) through July 8, 1993 (Pl. Mem. at 7.).[2]

---

**1.** By amendment dated as of April 1, 1993, Malhotra's affiliate World Phone, Inc. became a party to the Agreement. (Second Amendment to Cooperative Marketing Agreement, Art. 1.)

IAN amended its complaint after the production to it by AT & T of the Agreement. IAN has not sought leave to amend again in response to the present motion.

**2.** Paragraph 7.1 of the Agreement provides that "[d]uring the Term of this Agreement, AT & T

Initially, the Agreement was applicable to four countries. (Am.Cplt. ¶ 17.) In May of 1992, the Agreement was made applicable to some 120 countries. (*Id.* ¶ 17.)[3]

IAN has sought to enter into an agreement with AT & T "on the same terms and conditions" as the Agreement, but AT & T has refused to do so. (*Id.* ¶¶ 20, 22.)

The alleged economic impact on IAN of AT & T's refusal to enter into an agreement with IAN similar to the Agreement is summarized by IAN thus:

> Defendant controls an essential facility to the completion of international audiotext services. Duplication of defendant's international transport and billing services and arrangements by plaintiff would be economically infeasible and denial of its use inflicts a severe handicap on plaintiff and other potential market entrants. Without access to both the toll settlement arrangements and switching facilities of defendant, plaintiff cannot duplicate the call completing capability provided by defendant to Malhotra or collect the charges associated with the call.

(*Id.* ¶ 30.)

IAN also alleges that "[t]he Agreement entails a joint venture between [AT & T] and Malhotra in which … AT & T provides transport and billing facilities and services to Malhotra for international inbound sent-paid calls to Malhotra's audiotext services." (*Id.* ¶ 7). Thus, IAN alleges, after referring to certain of the provisions of the Agreement,

"AT & T is, in fact, a competitor of [IAN] because by engaging in such intense overview and involvement AT & T is engaging in the same business as [IAN]." (*Id.* ¶ 12.)

**2: *Rule 12(b)(6) Standards in Antitrust Cases.***

■■■ "[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977) (citing *Nagler v. Admiral Corp.,* 248 F.2d 319 (2d Cir.1957), and 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 1228 (1969)). That does not mean that "conclusory allegations which merely recite the litany of antitrust will … suffice." *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991). An antitrust complaint must "adequately … define the relevant product market, … allege antitrust injury, [and] … allege conduct in violation of the antitrust laws." *Re-Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993). In considering the complaint on a motion under Fed.R.Civ.P. 12(b)(6), "[t]he Court must accept the pleader's allegations of facts as true together with such reasonable inferences as may be drawn in [the pleader's] favor." *Deep South Pepsi–Cola Bottling Co. v. Pepsico, Inc.,* 1989 WL 48400, at *5 (S.D.N.Y. May 2, 1989). In determining the present motion, the Court may, of course, consider the Agreement, which is "incorpo-

agrees not to enter into a cooperative marketing arrangement such as this Agreement for any countries to which this Agreement applies, covering in-bound international sent-paid calling to "POTS" telephone numbers for U.S.-based recorded voice information services." Pursuant to the amendment dated as of April 1, 1993, the term of the Agreement was extended "to include an additional period from July 8, 1993 until December 31, 1994 (the 'Extension Term')." (Art. 2.A.) "During the Extension Term, the provisions of Article 7 of the … Agreement (which concern exclusivity) shall no longer apply to any country." (*Id.* Art. 4.A.)

" 'POTS' is an acronym signifying 'plain old telephone service' (as distinguished from, for ex-

ample, 800–number or 900–number service)." (Def.Mem. at 6 n. 5.) "A 'sent-paid' call is one billed to the telephone number from which it is placed. A 'sent-paid' call initiated in a foreign country is thus billed to the caller's telephone number by the foreign telephone company responsible for service to that number." (*Id.* at 5 n. 4 (citations omitted)).

**3.** In a letter to Malhotra dated May 13, 1992, AT & T refers to an authorization to Malhotra "to initiate Audiotext service throughout the world." It is not clear, however, that this statement is intended to refer to more than the approximately 120 countries to which the Agreement was extended. The question is not relevant to the decision of the present motion.

rated in the [Amended Complaint] by reference." *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Materials publicly filed by or with the Federal Communication Commission ("FCC"), of which the Court may take judicial notice, may also be considered on the motion, at least as giving an indication of the nature of relevant practices in and policies affecting the telecommunications business. *Id.* at 774.

It has been very persuasively argued that an antitrust plaintiff whose complaint is challenged must articulate "a careful statement of his legal theory." Phillip Areeda & Donald F. Turner, *Antitrust Law,* ¶ 317e (1978). It is not clear however, in the Second Circuit, that the theory—as distinguished from the facts supporting it—must be set forth in the complaint itself, *see George C. Frey,* 554 F.2d at 554, but it is nevertheless not too much to ask that the theory—or "[a]lternative or multiple legal theories," Areeda & Turner, ¶ 317e—at least be fully argued in response to a dispositive motion. Not only will such argument enable a court to see how the facts alleged, if proved, would constitute a violation of the Sherman Act, but "the recommended specificity focuses discovery and thereby saves both parties' energies and costs." *Id.* "The heavy costs of modern federal litigation, especially antitrust litigation, and the mounting caseload pressures on the federal courts, counsel against launching the parties into pretrial discovery if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint." *Sutliff, Inc. v. Donovan Cos., Inc.,* 727 F.2d 648, 654 (7th Cir.1984) (Posner, J.).

### 3: *Section 2 of the Sherman Act.*

 Judge Sand has concisely summarized the requirements of a Section 2 claim:

Each of the activities which Section 2 seeks to proscribe has its own elements. Unlawful monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Attempted monopolization has three elements: "(1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.,* 822 F.Supp. 145, 153 (S.D.N.Y.1993) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), and *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ———, 113 S.Ct. 884, 890–891, 122 L.Ed.2d 247 (1993)). In addition:

It appears clear that a claim under the Sherman Act is stated both where a company leverages power in one market to create monopoly in another, and where a company uses monopoly power in one market to impede competition in another, whether or not it attempts to monopolize the second market, with resulting "tangible harm to competition."

*Viacom Int'l, Inc. v. Time Inc.,* 785 F.Supp. 371, 378 (S.D.N.Y.1992) (quoting *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990), and citing *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)).[4]

4. In *Berkey,* the court had said that "it is improper, in the absence of a valid business policy, for a firm with monopoly power in one market to gain a competitive advantage in another by refusing to sell a rival the monopolized goods or services he needs to compete effectively in the second market." 603 F.2d at 284. It has been suggested, however, in the wake of *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and *Spectrum Sports,* that, to sustain a monopoly leveraging claim, more must be shown than that the monopolist sought to obtain "a competitive advantage" in the second market, and that, rather, monopolization or at least a dangerous threat of monopolization, of the second market must be made to appear. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 626.1 (Supp. 1993). In *Twin Labs.,* the Second Circuit characterized the passage quoted from *Berkey,* 603 F.2d at 284, as requiring "tangible harm to competition" in the second market. 900 F.2d at 571. The District Courts in the Second Circuit have adhered to *Berkey,* with the *Twin Labs.* gloss.

IAN relies very substantially—indeed, it is fair to say, its Section 2 case turns—on the "essential facility" doctrine. *See* Am.Cplt. ¶¶ 24, 29, 30; Pl.Mem. at 6–7, 19–22. The essential facility doctrine is "a label that may aid in the analysis of a monopoly claim, not a statement of a separate violation of law." *Viacom,* 785 F.Supp. at 376 n. 12 (citing Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 736.1a (Supp. 1990)). In an early formulation, "[t]he essential facility doctrine, also called the 'bottleneck principle,' states that 'where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility.'" *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977) (quoting A.O. Neale, *The Antitrust Laws of the United States,* at 67 (2d ed. 1970)) (footnote omitted), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). The Second Circuit has adopted the Seventh's formulation of the elements of an "essential facility" claim: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI Communications Corp. v. American Tel. & Telegraph Co.,* 708 F.2d 1081, 1132–33 (7th Cir.) (citations omitted), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). *See Twin Labs.,* 900 F.2d at 569; *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 179 (2d Cir.1990). The "essential facility" doctrine, however, is in tension with another: "Antitrust law ... does not require one competitor to give another a break just because failing to do so offends notions of fair play." *Twin Labs.,* 900 F.2d at 568.

Both judicial and academic commentary makes it clear that each case in which an essential facility claim is put forward must be carefully examined, particularly as to the issues of whether the facility in question is truly "essential," the effect on competition of withholding the facility, and the situations in which the facility must be shared. *See generally Twin Labs.,* 900 F.2d at 569; *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376–77 (7th Cir. 1986) (Posner, J.), *rehearing & rehearing en banc denied,* 802 F.2d 217 (7th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *Fishman v. Estate of Wirtz,* 807 F.2d 520, 570–75 (7th Cir.1986) (Easterbrook, J., dissenting in part); Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶¶ 736.1, 736.2 (Supp.1993).

### 4: *The Relevant Markets.*

Analysis of IAN's Section 2 claims must begin with identification of the market it claims that AT & T has monopolized (or attempted to monopolize), and of the market in which the Agreement, under a monopoly leveraging theory, will allegedly work tangible harm to competition, as well as with some understanding of how those markets work. "It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo,* 603 F.2d at 268. "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Re–Alco Indus.,* 812 F.Supp. at 391. It has been said that the courts will "reject market allegations that make no economic sense under any set of facts," that, in other words, an antitrust plaintiff must "set out a theoretically rational explanation to support its proposed relevant product market." *Theatre Party Assocs., Inc. v. The Shubert Org., Inc.,* 695 F.Supp. 150, 154 (S.D.N.Y.1988).

IAN alleges two markets. (Am.Cplt. ¶¶ 24, 25.) The first is "the market for providing audiotext services within the United States to callers from overseas." (*Id.* ¶ 24.) AT & T challenges this definition on the ground that "it fails to offer any 'theoretically rational explanation' why callers from overseas ... would not regard audiotext services accessed through terminating telephones located outside the United States as substi-

---

*Carleton v. Vermont Dairy Herd Imp. Ass'n, Inc.,* 782 F.Supp. 926, 934 (D.Vt.1991); *Viacom,* 785 F.Supp. at 378 & 380 n. 14; *Ortho Diagnostic,* 822 F.Supp. at 155.

tutes for audiotext services accessed through terminating telephones located within the United States." (Def.Mem. at 17.) It is a good question, to which IAN does not really give an answer. Market definition, however, is generally ultimately a question of fact which "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers," *Eastman Kodak,* 504 U.S. at 482, 112 S.Ct. at 2090 (quoting *Grinnell,* 384 U.S. at 572), and the Court will not determine it on the present motion. *See Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 647 (S.D.N.Y.1992).

IAN immediately follows the market definition of paragraph 24 of the Amended Complaint, however, with a theory that, in any apparent real context, is not "plausible." *Theatre Party,* 695 F.Supp. at 154. IAN explains:

> AT & T has effective control over the manner in which calls are received in the United States from abroad. IAN, or any other IP, cannot receive calls directly from callers abroad, but must rely on AT & T to transport the call to the termination point (the IP's audiotext program). As a result of this "bottleneck" all calls coming from abroad must go through AT & T's network.

(Am.Cplt. ¶ 24) "Thus," IAN alleges, "individual callers in the relevant market cannot as a practical matter choose for themselves between Malhotra, IAN, or any other IP based on price and non-price competitive factors. Instead, as a practical matter, defendant makes the choice for them." (*Id.*)

IAN thus argues that AT & T's "network" is an "essential facility," and that AT & T's refusal to enter into an agreement with IAN similar to the Agreement effectively denies IAN access to that "essential facility." The flaw in this explanation of IAN's Section 2 claim is that there is no allegation of facts from which it can be inferred that AT & T has denied (or will deny) IAN access to the alleged "essential facility," AT & T's "network." Even if one concedes AT & T's "overwhelming control of international traffic to the United States" (Pl.Mem. at 22), IAN has not alleged facts from which it can be inferred that AT & T has refused to trans-

port or will not transport calls from overseas callers to IAN's United States telephone numbers just as it does calls from overseas callers to Malhotra's United States telephone numbers. Rather, the Amended Complaint itself alleges that it is "[p]ursuant to its *common carrier* obligations, [that] AT & T provides telecommunication facilities and services to terminate calls to Malhotra's audiotext services from overseas." (Am.Cplt. 8.) (Emphasis added.) There is no basis for the inference that AT & T will not, pursuant to those same common carrier obligations, transport and terminate any call from overseas to any IAN telephone number in the United States. Indeed, AT & T concedes that it *"must* terminate calls to IAN's telephone numbers." (Def.Mem. at 22.) Thus, there is no fact alleged (nor has IAN suggested it could allege facts) from which the truth can be inferred of IAN's conclusion: that AT & T, simply by its control of facilities for transporting calls from overseas to the United States, somehow impedes the ability of individual overseas callers to call whatever IP they may wish to call. Further, since the telephone calls affected by the Agreement are POTS calls—billed to the caller by the overseas telephone company to whose service that caller subscribes, see n. 2, *supra*—there is no basis for inferring that the price of the call to the caller will be affected by the Agreement.

Nor does it assist the argument implicit in paragraph 24 of the Amended Complaint to invoke the concept of monopoly leveraging. Since IAN has not alleged facts from which it can be inferred that IAN has been or will be denied access to AT & T's "network," AT & T's control of that network—even assuming, *arguendo,* that there is no other way to transmit overseas calls to the United States—is irrelevant. A monopoly leveraging claim must be based, not only on a monopoly in one market, but use of that monopoly to bring about "tangible harm to competition" in another. *Twin Labs.,* 900 F.2d at 571. Whatever the degree of control AT & T may have "over the manner in which calls are received in the United States from abroad" (Am.Cplt. ¶ 24), since it cannot be inferred that AT & T will not transport calls

from abroad to IAN's (or any other IP's) telephone numbers in the United States, control of the former market does not work "tangible harm to competition," *Twin Labs.*, 900 F.2d at 571, in the latter.

The second market alleged by IAN is that "for providing transport and billing facilities and toll settlement arrangements required for the provision of international audiotext services by IPs who export audiotext services from the United States." (Am.Cplt. ¶ 25.) IAN goes on to explain that "[b]ecause of technical considerations described above defendant controls a predominant share of that market. Plaintiff and other IPs have no effective alternative to obtaining transport and billing facilities and toll settlement arrangements other than from defendant." (*Id.*) [5]

By "transport facilities" IAN appears clearly to mean the same AT & T "network" referred to in paragraph 24 of the Amended Complaint by which "calls are received in the United States from abroad" (*id.* ¶ 24), already considered above, and about which more need not be said. "[B]illing facilities and toll settlement arrangements" (*id.* ¶ 25), on the other hand, raise a different, and more difficult, question.

It is true, of course, that IAN does not, as far as its allegations go, compete in the market defined in paragraph 25 of the Amended Complaint. It does not provide (or seek to provide) "billing facilities and toll settlement arrangements." What the Court takes paragraph 25 to mean, then, is that AT & T's control (and withholding) of "billing facilities and toll settlement arrangements" is the means by which AT & T affects (or will affect) competition in the market (alleged in ¶ 24 of the Amended Complaint) in which IPs offer audiotext services based in the United States.

AT & T urges that it "provides no 'billing facilities' to Malhotra under the [ ] Agreement; this 'market' is therefore irrelevant to [IAN's] claim," and that " 'toll settlement arrangements' are made between AT & T (along with other United States carriers) and foreign PTTs and do not involve information providers." (Def.Mem. at 18.) [6] All of this may be true, but that does not answer the antitrust question of the possible economic impact of the Agreement on the market.

The Court assumes, since IAN alleges the existence of no facts from which the contrary can be inferred, that AT & T is correct in saying that it offers no actual "billing facilities" to Malhotra, and that AT & T deals directly with foreign PTTs, without involvement of Malhotra, in arriving at "toll settlement arrangements" with those foreign PTTs. Yet the Agreement can be seen to operate to the benefit of Malhotra in a manner which achieves a result analogous to the furnishing by AT & T to Malhotra of "billing facilities." Under the Agreement, Malhotra does not bill anyone for its services; nevertheless, by reason of the Agreement, it does obtain payment for calls made from overseas to one of its United States telephone numbers.

AT & T argues that IAN has a number of alternatives to an agreement with AT & T similar to the Agreement. IAN, it says, "may enter into a 900-service type of 'premium billing' arrangement with a domestic carrier in the foreign country whereby the carrier bills the caller for the call and remits a portion of the revenues earned to the information provider." (Def.Mem. at 24.) [7] AT & T also points out that the Agreement "did not and could not prevent other carriers from paying other information providers marketing commissions for traffic stimulation ser-

---

**5.** It is not clear what IAN means by "technical considerations described above." (*Id.*) The Court must assume that the reference is to the AT & T "network" discussed above through which "all calls coming from abroad must go." (*Id.* ¶ 24.)

**6.** "[F]oreign PTTs" are "correspondent post, telephone and telegraph companies ... in other countries." (*Id.* at 3.)

**7.** AT & T represented at oral argument that, at the present time, it does not offer 900-service arrangements in connection with calls from foreign countries. (Transcript, Sept. 15, 1993, at 18.)

vices." (Def.Reply Mem. at 9.)[8] Or IAN could require foreign callers to supply a credit card number to which IAN could charge a fee for its services. (Transcript, Sept. 15, 1993, at 24.)

IAN argues in response that the alternatives suggested by AT & T are not realistic. It suggests, although somewhat vaguely, various difficulties (or impossibilities) to be encountered in any attempt to establish a 900–service arrangement with a local telephone company in at least a number of the some 120 countries covered by the Agreement. (*Id.* at 30–33.) The MCI offer (*see* note 8, *supra*), according to IAN, is limited to a few countries. (Transcript, Sept. 15, 1993, at 34.) IAN doubts the practicality, in at least a number of the 120 countries, of its charging callers' credit cards. (*Id.* at 29–30.)

The difficulty with IAN's arguments regarding the lack of alternatives to an arrangement with AT & T similar to the Agreement is that there is nothing alleged in the Amended Complaint about the situation other than the bare conclusions that IAN has "no effective alternative" (Am.Cplt. ¶ 25), that billing services "cannot be made available" to IAN (*id.* ¶ 26), and that duplication of the billing services by IAN "would be economically infeasible." (*Id.* ¶ 30.) Such a failure to allege facts—as opposed to conclusions—regarding a claimed relevant market could, of itself, be a ground for dismissal. *See Gianna Enters. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1353–54 (S.D.N.Y. 1982). The Court will assume, nevertheless, that IAN could, by amendment, allege the difficulties it asserted at oral argument that it would face, absent an agreement similar to the Agreement, in obtaining payment for its services from overseas callers.

Finally, IAN has suggested (although not alleged in the Amended Complaint) a third

relevant market: that consisting of "worldwide telephone traffic originating or terminating in the United States." (Letter Brief, Sept. 23, 1993, at 2.)

Thus, giving IAN the benefit of a number of doubts, the Court, for purposes of the present motion, will assume three markets: (1) a market (in which IAN seeks to participate) in which overseas callers call IPs based in the United States; (2) a market (in which IAN does not participate or seek to participate, but in which AT & T does participate) in which AT & T provides "billing services";[9] and (3) a market (in which IAN does not participate or seek to participate, but in which AT & T does participate) for worldwide telephone traffic originating or terminating in the United States. The Court understands IAN's monopolization claim to be twofold: by its "actual" monopolization claim, it asserts that AT & T has monopolized the first of these markets, and by its monopoly leveraging claim it asserts that AT & T has monopolized the second or the third, or both, with resulting "tangible harm to competition," *Twin Labs.,* 900 F.2d at 571, in the first.[10]

IAN has raised the issue of the nature of AT & T's participation in the first of these enumerated markets. AT & T and Malhotra, it says, are engaged in a joint venture (Am. Cplt. ¶ 7), so that AT & T is a competitor of IAN. (*Id.* ¶ 12.) AT & T disputes such assertions.

Neither the statement in the Agreement that "[t]he relationship of the parties under this Agreement shall be and at all times remain one of independent contractors and not that of franchisor and franchisee or joint venturers" (¶ 1.2), nor the congratulatory letter of an AT & T employee to Malhotra alleged in Paragraph 9 of the Amended Complaint ("I am delighted that we are now

8. "Traffic stimulation services" is AT & T's characterization of the services for which it pays Malhotra under the terms of the Agreement. AT & T has suggested that MCI is offering such an arrangement at least as to calls from some foreign countries. (Transcript, Sept. 15, 1993, at 19–20.)

9. As noted above, AT & T does not actually bill anyone on behalf of Malhotra, but Malhotra does

receive an analogous benefit under the Agreement. The Court will refer to this benefit as "billing services," retaining the quotation marks.

10. IAN distinguishes between its "actual" monopolization and monopoly leveraging claims in its Letter Brief of September 23, 1993. *See id.* at 1–2 & 4 n. 6.

aggressively progressing on our joint venture") is of itself dispositive of the question whether a joint venture was formed by the Agreement. The former is self-serving; the latter is plainly not intended as a legal characterization.

It can be determined, however, as a matter of law, that the Agreement did not create a joint venture. The Agreement provides: "The construction, interpretation and performance of this Agreement shall be governed by the laws of the State of New Jersey." (¶ 14.)

 New Jersey law concerning the necessary characteristics of a joint venture is discussed at some length in *Wittner v. Metzger*, 72 N.J.Super. 438, 178 A.2d 671 *cert. denied*, 37 N.J. 228, 181 A.2d 12 (1962). A "joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly *ex contractu*, express or implied." 178 A.2d at 674 (citations omitted). That does not mean that a contractual statement that the contracting parties are (or are not) joint ventures ends all inquiry. To be joint venturers, the parties must contract to certain things, discussed in *Wittner*, one of which is reflected in the statement that "a joint adventure is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." 178 A.2d at 675 (quoting *Kurth v. Maier*, 31 A.2d 835, 836 (N.J.Ct. of Err. & App.1943)). IAN has not alleged, nor has it cited any provision of the Agreement to the effect, that, in proceeding under the Agreement, Malhotra is to share any losses AT & T may incur. Thus, under New Jersey law, AT & T and Malhotra are not joint venturers.[11]

That AT & T is not a joint venturer with Malhotra, of course, does not necessarily mean that the Agreement cannot have an effect in the market in which Malhotra participates, and IAN seeks to participate, in which overseas callers call IPs based in the United States.

### 5: *Monopoly Power.*

 The first element of a monopolization claim is "possession of monopoly power in the relevant market." *Ortho Diagnostic*, 822 F.Supp. at 153 (quoting *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04). Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704 (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)). *See also Broadway Delivery Corp. v. United Parcel Serv., Inc.*, 651 F.2d 122, 126–27 (2d Cir.) ("[T]he power to control prices or exclude competition ... in the relevant market." (citations omitted)), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704.

Again, the Amended Complaint is conclusory: IAN alleges, with respect to the "market for providing transport and billing facilities and toll settlement arrangements" (Am. Cplt. ¶ 25), that AT & T "controls a predominate [sic] share of that market." (*Id.*) And it alleges that "[b]y virtue of defendant's power to decide whether to execute [agreements similar to the Agreement], AT & T exercises monopoly power over the relevant market [which of the two markets alleged in paragraphs 24 and 25 of the Amended Complaint is not identified, but IAN may mean both] that is vital to IAN's revenue flow and competitive success." (*Id.* ¶ 32.) The Amended Complaint does not, however, indicate what AT & T's share of either of the markets actually alleged is.

With respect to the third market referred to by IAN in its Letter Brief of September 23, 1993—the market consisting of "worldwide telephone traffic originating or terminating in the United States" (*id.* at 2)—IAN does suggest an AT & T market share. AT & T, in its moving papers, has stated that "[t]he Court may take judicial notice that as of 1991 AT & T received only 70.8 percent of telephone traffic originating or terminating

---

11. New York law similarly requires that in an agreement constituting a joint venture, "there must be a provision for the sharing of both profits and losses." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990).

in the United States." (Def.Mem. at 21 (citing Linda Blake & Jim Lande, Common Carrier Bureau, Industry Analysis Division, FCC, *International Communications Commission Traffic Data Report for 1991*, D1–D6 (1992))). IAN has enlisted that statement in support of its Section 2 claims. As a general proposition, a market share of 70% should be an adequate (if barely adequate) basis, at the pleading stage, for an inference of power in a relevant market. *See Ortho Diagnostic*, 822 F.Supp. at 153 ("Courts routinely find monopoly power where the market share is greater than 70 percent.")[12]

Thus, the Court is left with two alleged markets AT & T's share of which is not alleged, and one unalleged market of which there is some evidence that AT & T has a share from which, if alleged, the inference could be drawn that, in that market, AT & T has monopoly power. This situation, again, would be a ground, by itself, for dismissal. *See World Arrow Tourism Enter., Ltd. v. Trans World Airlines, Inc.*, 582 F.Supp. 808, 811–12 (S.D.N.Y.1984). The Court will, however, draw such inferences as it may in plaintiff's favor for purposes of the present motion.

As to the market in which overseas callers call IPs based in the United States, the Court will assume that, although AT & T is not a joint venturer with Malhotra, it indirectly participates in that market through the Agreement. Further, the Court will assume that AT & T, through the Agreement, receives a predominant share of overseas calls to United States based IPs by reason of the FTC policy of "proportionate return" or otherwise.[13]

In the case of the markets in which IAN does not participate (or seek to participate)—that in which AT & T provides "billing services" and that consisting of "worldwide telephone traffic originating or terminating in the United States"—the Court will assume, for purposes of the present motion, that AT & T has, again, a share of a magnitude sufficient to satisfy any numerical test applicable at the pleading stage. AT & T has volunteered that it has (or had in 1991) a 70.8% share of the second of such markets; its ability to supply "billing services" may be taken, for purposes of the present motion, to be roughly commensurate with its 70.8% share of the second market.

Thus, for purposes of the present motion, AT & T will be considered to have market shares in the markets IAN has alleged, or suggested, from which monopoly power can be inferred. It must be kept in mind, however, that "a heavy reliance on market share statistics is likely to be an inaccurate or misleading indicator of 'monopoly power' in a regulated setting." *MCI*, 708 F.2d at 1107. Rather, "the size of a regulated company's market share should constitute, at most, a

12. A greater than 70% share, of course, does not establish, irrespective of any other consideration, monopoly power. Rather, "a share above 70% is usually strong evidence of monopoly power." *Broadway Delivery*, 651 F.2d at 129.

13. The question of "proportionate return" was injected into the case when AT & T, prefacing its statement, quoted above, that "as of 1991 [it] received only 70.8 percent of telephone traffic originating in the United States," stated that the FCC "requires foreign correspondents to allocate in-bound traffic to U.S. carriers in proportion to the amount of out-bound traffic that each carrier sends to the foreign correspondent. This requirement is referred to as 'proportionate return.'" (Def.Mem. at 21 (citing *In re Regulation of Int'l Accounting Rates*, 7 FCCRcd No. 25, 8040–41, 8045–46).) *See generally*, Michael J. Kellogg, John Thorne, Peter W. Huber, *Federal Telecommunications Law*, § 15.5.2 (1992), for the context and purpose of the "proportionate return" policy. By Memorandum and Order dated June 9, 1994, the Court requested the parties to brief the significance of the "proportionate return" policy to the present motion. AT & T argues that it is irrelevant; IAN that it supports its Section 2 claims. It appears from the parties' supplemental briefing that it is not the case under the "proportionate return" policy, as the Court had thought it might be, that "if [AT & T] has a 70.8% market share (overall) of out-bound traffic to foreign countries, it must have a 70.8% share of in-bound traffic from foreign countries, and also a 70.8% share of in-bound traffic to Malhotra, with other U.S. Carriers receiving the balance." (Mem. & Order, June 9, 1994 at 2.) (*See* Def.Supp.Mem. at 7–9.) On the other hand, there is nothing in the parties' supplemental briefing to show that AT & T's share of in-bound traffic to Malhotra (or of all overseas calls to United States based IPs, to the extent that there is such traffic to anyone other than Malhotra) is not of a magnitude sufficient to satisfy any numerical test applicable at the pleading stage.

point of departure in assessing the existence of monopoly power." *Id.*

## 6: *Monopolization.*

■■■ Even if a defendant has monopoly power, of course, a plaintiff must show more. Section 2 "does not prohibit monopoly *simpliciter.*" *Berkey,* 603 F.2d at 273. "Not the possession, but the abuse, of monopoly power violates section 2." *Olympia,* 797 F.2d at 374. A plaintiff must also show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Ortho Diagnostic,* 822 F.Supp. at 153 (quoting *Grinnell,* 384 U.S. at 571–72, 86 S.Ct. at 1704–05).

■■■ In the present case, IAN does not allege that AT & T acquired monopoly power improperly. Rather, the *gravamen* of the Amended Complaint is that AT & T is maintaining alleged monopoly power in the market in which overseas callers call United States based IPs, or seeking to monopolize that market, through leveraging its alleged monopoly power in the other asserted markets. And the means by which AT & T is claimed to be doing this—whether in IAN's "actual" monopolization claim or its monopoly leveraging claim[14]—is by withholding from IAN the "billing services" afforded to Malhotra by the Agreement, *i.e.,* an alleged "essential facility." The application of the "essential facility" doctrine to the facts alleged by IAN must, therefore, be examined.

The "essential facility" doctrine is, in the first place, an exception to the general rule that "a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches." *Olympia,* 797 F.2d at 375 (citations omitted). Or, as put in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985),[15] "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor." 472 U.S. at 600, 105 S.Ct. at 2856. *See also Twin Labs.,* 900 F.2d at 568.

An examination of the principal cases establishing the "essential facility" doctrine, and sustaining claims under it, shows that IAN has not alleged facts which support the proposition that AT & T is not free not to deal with IAN, but must rather supply IAN with the "essential facility" of "billing services" by entering into an agreement with IAN similar to the Agreement.

The origin of the "essential facility" doctrine can be traced, it has been suggested,[16] to *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). In that case, a group of some fourteen railroads had, through the commonly owned defendant association, acquired "substantially every terminal facility by which the traffic of St. Louis is served." 224 U.S. at 394, 32 S.Ct. at 509. As later characterized by the Supreme Court, "[t]he combination had acquired control of all available facilities for connecting railroads on the east bank of the Mississippi with those on the west bank." *Associated Press v. United States,* 326 U.S. 1, 25, 65 S.Ct. 1416, 1427, 89 L.Ed. 2013 (1945). The *Terminal* Court ordered a reorganization of the arrangement which would permit other railroads to use the facilities.

The *Terminal* case did not proceed on an express "essential facility" doctrine. The doctrine seems first to have been expressly formulated in *Hecht.* At issue in *Hecht* was a claim by the plaintiff (the unsuccessful applicant for an American Football League franchise) that the defendant (the owner of the Washington Redskins) had violated the

---

**14.** *See* n. 10, *supra.*

**15.** *Aspen* does not discuss the "essential facility" doctrine as such, but is nevertheless pertinent. "Although the Court did not rest on the essential facility doctrine utilized by the Tenth Circuit [in *Aspen* ], its decision may very well influence the disposition of subsequent denials of an alleged essential facility." Phillip A. Areeda & Herbert

Hovenkamp, *Antitrust Law,* ¶ 736.1f (Supp.1993) (footnote omitted).

**16.** *See Hecht,* 570 F.2d at 992; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 736.1b (Supp.1993); Note, *Unclogging the Bottleneck: A New Essential Facility Doctrine,* 83 Col.L.Rev. 441, 449 (1983) ("[t]he first essential facility case").

antitrust laws by refusing to share Washington's only football stadium. The court sustained a jury instruction elaborating the "essential facility" doctrine. 570 F.2d at 992–93.

In *Hecht*, the court relied on *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), as well as on the *Terminal* case, in setting forth the "essential facility" doctrine. *See* 570 F.2d at 992. In *Otter Tail*, the defendant had been found to have attempted to monopolize and to have monopolized the retail distribution of electric power in its service area. The Court described the relevant market thus:

> In towns where Otter Tail distributes at retail, it operates under municipally granted franchises which are limited from 10 to 20 years. Each town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail. The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail. That competition is generally for the right to serve the entire retail market within the composite limits of a town, and that competition is generally between Otter Tail and a prospective or existing municipal system. These towns number 510 and of those Otter Tail serves 91%, or 465.

410 U.S. at 369–70, 93 S.Ct. at 1025–26 (footnote omitted). Among the means used by the defendant to maintain its monopoly position, in the face of attempts by towns in the area to replace the defendant as distributor of electric power in towns with municipal distribution systems, were "refusals to 'wheel' power to such systems, that is to say, to transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility." *Id.* at 368, 93 S.Ct. at 1025. The Court noted that "[p]roposed municipal systems have great obstacles; they must purchase the electric power at wholesale. To do so they must have access to existing transmission lines. The only ones available belong to Otter Tail." *Id.* at 370, 93 S.Ct. at 1026. (footnote omitted). The Court sus-

tained the District Court's finding that "Otter Tail's refusals ... to wheel were solely to prevent municipal power systems from eroding its monopolistic position." *Id.* at 378, 93 S.Ct. at 1030.

These seminal cases—*Terminal, Otter Tail* and *Hecht*—fit well within the Second Circuit's description of the "essential facility" case law set out in *Twin Labs.*:

> A leading antitrust commentator would limit the analysis to "facilities that are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately." Most of the successful essential facility claims fall within the categories stated by this commentator. In cases finding liability in other categories, however, the facility in question was more than dominant; it was effectively the only one in town.

900 F.2d at 569 (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 736.2 (Supp.1988)) (other citations omitted).

The *Terminal* case was a case of a "natural monopoly," as well as "the only [facility] in town." *Twin Labs.*, 900 F.2d at 569. As the *Terminal* court noted:

> The result of the geographical and topographical situation is that it is, as a practical matter, impossible for any railroad company to pass through, or even enter St. Louis, so as to be within reach of its industries or commerce, without using the facilities entirely controlled by the Terminal Company.

224 U.S. at 397, 32 S.Ct. at 510–11. *Otter Tail*, as well, is a "natural monopoly" case, in which each town was a "natural monopoly market for the distribution and sale of electric power at retail." 410 U.S. at 369, 93 S.Ct. at 1025. *See Twin Labs.*, 900 F.2d at 569. And *Hecht*, plainly, is a case of "the only [facility] in town." *Id.* In *Hecht*, there was evidence that "RFK stadium is the only stadium in the D.C. metropolitan area that is suitable for the exhibition of professional football games." 570 F.2d at 993 (footnote omitted).

IAN's allegations do not bring it within the "essential facility" doctrine originating in

such cases as the *Terminal* case, *Otter Tail* and *Hecht,* and as summarized in *Twin Labs.* There is no suggestion that AT & T's "billing services" are "facilities whose duplication is forbidden by law" or that they are "publicly subsidized and thus could not practicably be built privately." *Twin Labs.,* 900 F.2d at 569. Nor are they a "natural monopoly"—or the result of a "natural monopoly"—or the "only [facility] in town." *Id.*

AT & T, although it may have the largest share of the market for telephone calls from and to the United States, does have competitors. If it has a dominant market share, it does not follow that it has a "natural monopoly," defined as the situation existing where "the market can support only one efficient producer." Philip A. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 736.1 (Supp. 1993).

And AT & T's "billing facilities" are not "the only one[s] in town." *Twin Labs.,* 900 F.2d at 569. AT & T has pointed out various alternatives by which IAN could bill overseas callers to its United States telephone numbers. IAN has alleged no facts—as opposed to conclusions—from which it can be inferred that none of these alternatives are feasible. Even if IAN had alleged (or were to allege) the difficulties it proffered at oral argument, those difficulties are nevertheless difficulties, not practical impossibilities. That to bill its customers other than through AT & T might require some effort on the part of IAN, *e.g.,* by contacting AT & T's competitors, or the overseas carriers which must in the first instance bill IAN's customers, with a proposition analogous to the Agreement, does not mean that IAN is unable "practically or reasonably," *MCI,* 708 F.2d at 1132, to bill its customers.

The meaning of a plaintiff's "inability practically or reasonably to duplicate the essential facility," *MCI,* 708 F.2d at 1132, can be illustrated by reference to a Second Circuit case relied on by IAN, *Delaware & Hudson.* In that case, reminiscent of the *Terminal* case (and *Otter Tail* ), "[t]he alleged essential facility [was] Conrail's tracks used for short haul routes, e.g., the Harrisburg–Lancaster tracks in the hypothetical Quebec–Lancaster

run." 902 F.2d at 179. The court "agree[d] with the district court's statement that 'physical duplication of [Conrail's] lines would be an impractical and unreasonable project to undertake.'" *Id.* (quoting 724 F.Supp. at 1079). For IAN to seek out agreements similar to the Agreement, with either AT & T's competitors or with foreign carriers, on the one hand, and the construction of rail lines (or electric subtransmission lines or a football stadium), on the other, are, plainly, very different things.

*Aspen,* although not an "essential facilities" case,[17] is relied on by IAN, and must also be considered. *Aspen* is written against the general proposition that:

> "The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors." [Defendant], therefore, is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor.

472 U.S. at 600, 105 S.Ct. at 2856 (quoting *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 2116, 45 L.Ed.2d 41 (1975)). The Court recognized, however, that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id.* at 601, 105 S.Ct. at 2856 (footnote omitted).

In *Aspen,* the plaintiff and the defendant had engaged, for a number of years, in a joint marketing program, distributing tickets admitting purchasers to the slopes of one mountain controlled by the plaintiff and three controlled by the defendant. The defendant then refused to continue the arrangement. Thus, the Court pointed out:

> [T]he monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, the monopolist elected to make an important change in a pattern of distribution that had originated in a com-

---

**17.** *See* n. 15, *supra.*

petitive market and had persisted for several years.

472 U.S. at 603, 105 S.Ct. at 2858.

The Court found the defendant's conduct to be predatory. The evidence, it noted, supported inferences both that the defendant "made a deliberate effort to discourage its customers from doing business with its smaller rival," 472 U.S. at 610, 105 S.Ct. at 2861, and, importantly in the present context, that the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for perceived long-run impact on its smaller rival." 472 U.S. at 610–11, 105 S.Ct. at 2861–62 (footnote omitted).

In the present case, there is no allegation of efforts on AT & T's part to discourage customers from dealing with IAN: AT & T simply does not choose itself to deal with IAN. Nor is there any allegation beyond mere conclusions from which a predatory intent similar to that found in *Aspen* can be inferred. In describing the Agreement, IAN acknowledges that "[a]s the accounting rate of payments [to AT & T] are based upon minutes of connect time, the stimulation of traffic to the United States increases [AT & T's] revenues." (Am.Cplt. ¶ 14.) Nor is there any basis for inferring from IAN's allegations that AT & T, without IAN in the market, can increase its charges. The charges for calls to Malhotra's numbers are made, not by AT & T, but by the local carriers in the countries from which those calls originate. In short, the Court cannot infer from the facts alleged a predatory intent in AT & T's refusal to enter into an agreement with IAN similar to the Agreement.

Since IAN has not alleged facts from which it can be inferred that AT & T's refusal to render "billing services" to IAN by entering into an agreement with it similar to the Agreement denies IAN an "essential facility" or is predatory, IAN's monopolization claim must be dismissed.

### 7: *Attempted Monopolization.*

To sustain an attempted monopolization claim, a plaintiff must show "that the defendant has engaged in predatory or anticompetitive conduct." *Ortho Diagnostic,* 822 F.Supp. at 153 (quoting *Spectrum Sports,* — U.S. at ——, 113 S.Ct. at 890). For the reasons set forth in Section 6, *supra,* of this Memorandum and Order, IAN has not alleged facts from which it can be inferred that, in refusing to enter into an agreement with IAN similar to the Agreement, AT & T has engaged in predatory or anticompetitive conduct. IAN's attempted monopolization claim must be dismissed.

### 8: *Section 1 of the Sherman Act.*

IAN also claims that the Agreement is a contract in restraint of trade in violation of Section 1 of the Sherman Act. "The section 1 claimant must demonstrate (1) concerted action by two or more persons which (2) unreasonably restrains interstate trade or commerce." *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Serv.,* 746 F.Supp. 320, 325 (S.D.N.Y.1990). In the present case, there is concerted action, in the form of the Agreement. The issue is whether the Agreement, together with the facts— as opposed to conclusions—alleged by IAN are a sufficient basis from which to infer that the Agreement "unreasonably" restrains trade.[18] The Court concludes that they are not.

"Under § 1 of the Sherman Act, a business 'generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.'" *Aspen,* 472 U.S. at 601 n. 27, 105 S.Ct. at 2856 n. 27 (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984)).

There is no claim that AT & T acted other than independently in entering into the Agreement. Nor does the Agreement put AT & T in a position to raise consumer prices, since those are set by the foreign carriers servicing the telephones from which calls to Malhotra's telephone numbers are placed. And it cannot be inferred that the

---

**18.** IAN does not claim that AT & T's entry into the Agreement amounted to a *per se* violation.

Agreement precludes IAN from seeking an arrangement similar to the Agreement with another U.S. carrier, or with a foreign carrier. That Malhotra has agreed not to do so plainly does not prevent IAN from doing so.

IAN's Section 1 claim must be dismissed.

## 9: *The Communications Act.*

 IAN claims that AT & T's "refusal to provide transport services with toll revenue sharing in connection therewith, to [IAN] for international audiotext services impedes communication and competition and thereby constitutes an unreasonable practice" in violation of 47 U.S.C. § 201(b) (Am. Cplt. ¶ 51), and that AT & T's "refusal to provide billing and collection services to [IAN], on the same terms as provided to Malhotra, constitutes an unjust or unreasonable discrimination and undue preference" in violation of 47 U.S.C. § 202(a) (*Id.* ¶ 57.) [19]

The statutory provisions relied on by IAN do not apply to the "billing services" furnished by AT & T to Malhotra pursuant to the Agreement. [20]

The courts and the FCC—the agency charged with administration of the Communications Act—have recognized a distinction between the regulatory powers exercised by the FCC under Title II of that Act (including 47 U.S.C. §§ 201(b) and 202(a), relied on by IAN), and those exercised pursuant to 47 U.S.C. §§ 152 and 153. "Title II of the Act empowers the [FCC] to impose rate regulation only upon common carriers 'engaged in interstate or foreign *communication* by wire or radio.'" *Computer & Communications Indus. Assoc. v. FCC,* 693 F.2d 198, 207 (D.C.Cir.1982) (quoting 47 U.S.C. § 201(a) (emphasis by court)), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). The FCC exercises "ancillary jurisdiction" under 47 U.S.C. §§ 152 and 153 over certain activities that it does not regulate under Title II. *Id.,* 693 F.2d at 207. Rapidly developing technology has required the FCC in recent years to consider, and reconsider, whether various services offered by firms in the tele-

communications industry came within the scope of Title II.

Against this background, the FCC has issued several determinations that offer guidance on whether the "billing services" rendered by AT & T to Malhotra under the Agreement come within the scope of 47 U.S.C. §§ 201(b) and 202(a).

The nature of those "billing services" may first be recalled. A person calling one of Malhotra's United States telephone numbers is billed by that person's local (foreign) telephone company. AT & T, through the negotiation of accounting rates (*see* Am.Cplt. ¶ 14), receives a share of the caller's payment to the caller's local telephone company. AT & T then pays what amounts to a commission to Malhotra.

In its Report and Order in *Matter of Detariffing of Billing & Collection Servs.,* 102 F.C.C.2d 1150 (1986) (*"Billing & Collection Order"*), in which it considered "[b]illing and collection" defined as a "service provided by a local exchange carrier ... to an interexchange carrier ... whereby the former bills and collects from end users for services provided to end users by the [interexchange carrier]," *id.* at 1151 n. 2, the FCC sets forth the following general test:

> Two distinct questions must be asked in order to determine whether a particular activity is subject to such Title II regulation. Is the activity an interstate or foreign communication service? Is the person or entity offering the service as a common carrier? Although carrier billing and collection for a communication service that it offers individually or as a joint offering with other carriers is an incidental part of a communication service, we believe that carrier billing or collection for the offering of another unaffiliated carrier is not a communication service for purposes of Title II of the Communications Act.

*Id.* at 1168. The FCC noted, among other things, that "[b]illing and collection service does not employ wire or radio facilities and

---

**19.** It appears that IAN could have asserted its Communications Act claims before the FCC instead of this Court, although it cannot do both. 47 U.S.C. § 207.

**20.** As noted in Section 4, *supra,* of this Memorandum and Order, there is no basis for an inference that AT & T has not transported, or will not transport, calls to IAN's telephone numbers.

does not allow customers of the service, interexchange carriers, to 'communicate or transmit intelligence of their own design and choosing.'" *Id.* (quoting *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630, 641 n. 58 (D.C.Cir.) (quoting *Industrial Radiolocation Service,* 5 F.C.C.2d 197, 202 (1966)), *cert. denied* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976)). The FCC concluded that "billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Act." *Billing & Collection Order,* 102 FCC2d at 1169.

A later decision by the Chief of the Common Carrier Bureau, *Matter of AT & T 900 Dial–It Services and Third Party Billing and Collection Services,* 4 FCCRcd 3429 (1989) ("*AT & T 900 Dial–It*"), considered AT & T's Premium Billing service, offered to "Dial–It 900 service sponsor/subscribers who subscribe to the tariff's so called Sponsor Paid option whereby they become responsible for all tariffed charges associated with callers' use of the service." *Id.* at 3432 (footnote omitted). "Premium Billing charges are charges which the sponsor/subscriber assesses callers for use of his service. Such charges do not include common carrier communications service charges. AT & T bills callers for these Premium charges on behalf of the sponsor/subscriber." *Id.* at 3433. The decision (relying on the *Billing & Collection Order,* among other things), concluded that "Premium billing charges are not charges for Title II communications services." *Id. See also, Matter of Paul Ondulich v. AT & T Communications, Inc.,* 5 FCCRcd 3190 (1990) (decision of Chief, Enforcement Division, Common Carrier Bureau).

The relevant principle that can be extracted from these FCC decisions is that it is communications services that are regulated by Title II of the Communications Act, and that "billing services" that do not utilize communications over the common carrier's wire or radio facilities are not. AT & T's sharing of revenue with, or payment of commissions to, Malhotra do not involve AT & T's wire or radio facilities. In the present case, the amounts which IAN seeks to have AT & T collect for use of IAN's audiotext services are closely analogous to the Premium Billing charges found not to be Title II communications services in *AT & T Dial–It.* If that is correct—and IAN has made no convincing argument that it is not—then 47 U.S.C. §§ 201(b) and 202(a) do not apply to AT & T's "billing services" to Malhotra pursuant to the Agreement.

IAN's claims under 47 U.S.C. §§ 201(b) and 202(a) must be dismissed.

**10: *Conclusion.***

The Amended Complaint is dismissed.

SO ORDERED.